507 So.2d 184 (1987)
The AMERICAN LUNG ASSOCIATION OF LOUISIANA, INC.
v.
STATE MINERAL BOARD.
No. 86-C-1636.
Supreme Court of Louisiana.
May 18, 1987.
Sidney L. Shushan, Guste, Barnett & Shushan, New Orleans, for applicant.
William J. Guste, Jr., Atty. Gen., Gary Keyser, Asst. Atty. Gen., New Orleans, for respondent.
CALOGERO, Justice.
The 1974 Louisiana Constitution dictates that "the mineral rights on property sold by the state shall be reserved."[1]
The legal question which prompted us to grant a writ of review in this case is whether this constitutional provision affects the mineral interest claimed by a corporation which 1) donated property to the state, 2) sued to have the donation revoked based on an alleged failure by the State to use the property for the express donative purpose, and 3) with that litigation pending on appeal compromised the lawsuit with the state by (essentially) dividing the disputed property.
In the matter now before us plaintiff, American Lung Association of Louisiana, Inc., seeks to enjoin the State Mineral Board from advertising for the purpose of leasing and/or executing any lease of minerals on the property, and to secure a judgment quieting its title. The Mineral Board's peremptory exceptions were sustained. On plaintiff's appeal the court of appeal affirmed, for the reason that La. Const. Art. 9, § 4's requirement that mineral rights on property sold by the state be reserved, impaired a 1977 "Compromise Agreement" and companion 1978 "Act of Exchange" between American Lung and the State of Louisiana. The court of appeal concluded that the word "sold" as used in the constitutional provision is not limited only to situations where an "act of sale" has been passed, but rather is applicable to the "alienation of mineral rights," which, they concluded, is entailed in the compromise, 490 S.2d 343 (1986).
For the reasons which follow, we reverse the judgments of the lower courts, overrule the peremptory exceptions and remand to the district court for further proceedings.
*185 Created by 1912 La.Act 161, the State Tuberculosis Commission of the State of Louisiana, a public agency consisting of the Governor of the State of Louisiana and three other public officials, and subject to the general supervision of the State Board of Health, was "empowered to receive donations... and to hold, invest, use, employ and administer the same for the purpose of its creation." The State Tuberculosis Commission's stated purpose was protection of the public health by establishment of sanatoria, suppression of tuberculosis and provision for treatment of those ill with tuberculosis.
On May 8, 1924, the Louisiana Anti-Tuberculosis League, a private organization and predecessor of the American Lung Association of Louisiana, Inc., donated two tracts of land, the Greenwell Springs Tract and the Odom Tract, comprising 371.77 acres, to the State Tuberculosis Commission[2] without reserving the mineral rights, "for the location of sanatoria for persons suffering from tuberculosis." The Greenwell Springs Tuberculosis Hospital was built, apparently by the State Tuberculosis Commission, on the eastern part of the Greenwell Springs Tract.[3]
As time passed there were fewer tuberculosis patients in the state and substantially reduced need to use the hospital facilities as a tuberculosis sanatorium. As a result of this reduced need, the state, although it continued to use the Greenwell Springs Hospital to treat tuberculosis patients, began to house minimum security Angola prisoners at Greenwell Springs for treatment of maladies other than tuberculosis. Additionally, the state opened up an alcohol treatment center at the hospital. In 1975, the American Lung Association of Louisiana, Inc., filed suit against the State of Louisiana through the Louisiana Health and Human Resources Administration (successor in interest to the Tuberculosis Commission), to revoke the donation and recover the property, on the ground that the land was no longer being used for the donative purpose. The trial court dismissed American Lung's suit. With appeal pending, the parties reached a voluntary settlement under the terms of which American Lung would receive $75,000 from the State, the unimproved 121.51 acres west of a north/south state road which divided the Greenwell Springs Tract and the entirety of the Odom Tract, which consisted of approximately 100 acres; in return the State would receive 161.88 acres of the Greenwell Springs Tract, all east of the same road, and upon which the Greenwell Springs Hospital was situated. The result was that American Lung was returned 221.51 acres of the 371.77 acres originally donated.
On April 28, 1977 a notarial act was passed in which attorneys representing the American Lung Association and the State *186 of Louisiana appeared. In the notarial act, entitled "Compromise Agreement," the appearers declared that in order to carry out and consummate a compromise and settlement of the pending litigation American Lung and the State, through the Louisiana Health and Human Resources Administration, did agree that the differences and controversies in the lawsuit "shall be settled, adjusted and compromised" on certain terms and conditions, including the following: "Subject to confirmation of this entire agreement by the Legislature of the State of Louisiana, in the regular session of 1977, the State of Louisiana agree[d] to pay to the American Lung Association of Louisiana, Inc." $75,000, and did, in that instrument, convey, assign, and quitclaim "all right, title, and interest it may have" in 121.51 acres comprising that portion of the Greenwell Springs Tract west of the north/south road and the entirety of the approximately 100 acre Odom Tract; i.e., 221.51 acres of the originally donated 371.77 acres.
In return American Lung agreed to, and did convey, assign, and quitclaim all right, title and interest it may have had in the 161.88 acres which comprised the eastern portion of the Greenwell Springs Tract, on which the hospital was located. The notarial act further expressed that the parties did thereafter abandon any pending or future litigation with regard to the right to such property and expressed that the parties were to receive their respective properties with freedom to use it in any lawful manner or for any lawful purpose. The "Compromise Agreement" went on to express that each of the parties, American Lung and the State of Louisiana, expressly bound and obligated themselves that they would execute and deliver such further written instruments and assurances as might be required to effectuate, carry out, and to do and perform each and all of the obligations imposed upon them under the terms and provisions of the agreement.
The record in this lawsuit does not indicate whether the "Compromise Agreement" was confirmed by the Legislature in the regular session of 1977, a contemplated occurrence to which the agreement was subject. However, the record does show that in the regular session of 1977 the general appropriation bill included $75,000 to acquire "permanent title to the property known as the Greenwell Springs Hospital." The State has not in these proceedings complained about any such possible deficiency as regards effectuation of the compromise.[4]
The companion document, contemplated when the parties in the Compromise Agreement recited that they would thereafter "execute and deliver such other and further written instruments and assurances as may be required to effectuate, carry out, and to do and perform all of the obligations imposed on them," is an "Act of Exchange" between American Lung Association of Louisiana, Inc. and the State of Louisiana, executed before a notary public on March 30, 1978. In that instrument the state, through its Governor, paid American Lung $75,000, and made an "exchange of property," transferring to American Lung what interest the State might have had in 221.51 acres of the earlier donated property, with American Lung transferring to the State all of such interest as they might have had in the 161.88 acre portion and the hospital thereon, all consistent with what had been set forth with equal specificity in the "Compromise Agreement."
Two other events are worth noting at this point. By Act 959 of the regular session of 1984 (after the district court had tried this lawsuit and taken it under advisement) the Legislature authorized and directed the state through the Office of *187 Lands and Natural Resources of the Department of Natural Resources, to release and quitclaim unto American Lung all of the interest the state might have in the minerals and mineral rights in the 221.51 acres which in 1977 and 1978 the State had quitclaimed and/or transferred incident to the compromise. However, that act, No. 959, is not made part of the record in this case, for it was enacted after this case was taken under advisement and shortly before judgment was rendered in the district court. That act is not essential to our disposition in this case.[5] Therefore, we neither address its application nor its constitutionality.[6] The second event worth noting was the passage of concurrent Resolution No. 77 in 1985. That resolution passed after the district court had ruled in this lawsuit and with the case pending on appeal to the court of appeal. It authorized the institution and/or continuance of American Lung's lawsuit.
In October of 1979, American Lung executed a mineral lease on the 221.51 acres. The lease was duly recorded in the conveyance records of East Baton Rouge Parish and American Lung since then has been receiving mineral royalties.
In August of 1983, the State Mineral Board received from a private party an "application,"[7] or an indication of interest in the State's right to the minerals in the 221.51 acres. The State Mineral Board decided to advertise the land publicly for mineral leasing. When American Lung protested, the Mineral Board requested and received an opinion[8] from the Louisiana Attorney General that the mineral rights in the 221.51 acres belonged to the state. On the strength of that opinion, the Mineral Board publicly advertised the acreage for mineral leasing.
American Lung filed a petition to quiet their title and to enjoin the state from leasing the mineral rights on the property. The Mineral Board filed exceptions of no right of action and no cause of action. The state claimed that American Lung had no cause of action because the state was constitutionally prohibited from selling or exchanging any mineral rights by virtue of Art. 9, § 4(A). The state also claimed that American Lung had no right of action because it had not obtained legislative authorization to sue the Mineral Board, a state agency, as required by Art. 12, § 10 of the 1974 Constitution.
Both parties filed motions for summary judgment, and a hearing was conducted on the state's exceptions of no cause and no right of action. After taking the case under advisement, the trial court sustained the state's exceptions of no cause and no right of action and dismissed American Lung's lawsuit. The court of appeal affirmed, concluding that the "Act of Exchange" between the parties was the legal equivalent of a sale by the state, and Art. 9, § 4(A) of the 1974 Constitution, reserving mineral rights in sales by the state, precluded American Lung from asserting ownership of the minerals.
The donation by plaintiff's predecessor of the 371.77 acres in 1924 contained no reservation of minerals. Similarly, the Compromise Agreement and companion Act of Exchange did not, on behalf of either party, contain any reservation of mineral rights. And, focusing on the state's *188 participation in the latter agreements, the state did not expressly convey the mineral interests.
Furthermore, both in 1924, when the state acquired this property by donation, and in 1977 and 1978, when they executed the companion compromise and exchange documents, the Constitutions of 1921 and 1974 in almost identical language, required that in all cases the mineral rights on property sold by the state shall be reserved.[9]
The constitutional impediment to the state's selling the mineral rights to its property is founded on sound principles designed to protect the public interest. First, as stated by the late Judge (and former Justice) Albert Tate, Jr. in his concurring opinion in King v. Board of Commissioner's for the Atchafalaya Basin Levee District, 148 So.2d 138 (La.App. 3rd Cir.1962) writ denied, 244 La. 118, 150 So.2d 584 (1963), a reason behind the provision is to prevent the plundering of valuable state assets "for the benefit of the privileged few with inside knowledge or connections, rather than used for the benefit of all people in whom the title to the minerals under State lands is vested." A related reason for such a provision is that the reservation, by preventing immediate divestiture of title, preserves valuable State assets for future generations. See Note 21 La.L.Rev. 271 (1960).
The State relies upon language in two opinions which indicate 1) that the prohibition after 1921 against the "alienation" of minerals by the state applied to levee boards as well as to the state,[10] and, 2) that the prohibition of the "alienation" of minerals by the state also prohibits acquisition of these minerals by the running of acquisitive prescription.[11]
*189 From this the state argues, and perhaps correctly, that the prohibition applies to all alienations of mineral rights by the state, not just sales. Nonetheless our only jurisprudence involves cases wherein the contest over the state's mineral rights arose out of either a sale of state land,[12] the running of acquisitive prescription in favor of a party adverse to the state,[13] or the redemption by a owner of lands adjudicated to the state for taxes.[14] Neither boundary resolutions involving the state, nor quitclaims by the state, have been addressed in the jurisprudence. Nor, for that matter, have exchanges or compromises been addressed in this context.
"Exchange is a contract by which the parties to the contract give to one another one thing for another, whatever it be, except money; for in that case it would be a sale." C.C. 2660. And a true exchange is the legal equivalent of a sale. Womack v. Sternberg, 247 La. 566, 172 So.2d 683 (1965). Furthermore, La.Civ.Code art. 2667 (West 1987) states:
All of the other provisions relative to the contract of sale apply to the contract of exchange.
And in this last contract each of the parties is individually considered both as vendor and vendee. C.C. 2667.
As a consequence, conveyance of mineral rights by the state through a simple exchange of property is probably prohibited by Art. 9, § 4's reservation to the state of mineral rights on property sold by the state.
The difficulty, however, with the finding by the court of appeal in this case is that the transaction here, in its essence, was not an exchange. There were no land parcels, owned respectively by the parties, conveyed respectively, one parcel for the other, with the attendant trading of reciprocal unfettered interests. The companion documents, rather, constituted together a single transaction, a single compromise of conflicting claims to the ownership of the entire 371.77 acres. That reality, that intention of the parties, is evident from the companion documents and the history of the controversy.
A compromise is something entirely different from a sale, and from an exchange. La.Civ.Code art. 3071 (West 1987) states in pertinent part:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
The compromise evidenced by the companion documents in this case did exactly what is expressed in the foregoing civil code article. The parties, in order to put an end to a lawsuit and adjust their differences by mutual consent in a manner which they agreed upon, entered into a compromise, an agreement which each of them preferred, to the hope of gaining and the risk of losing. And that compromise agreement committed the parties to execute such other and further written instruments as might thereafter be required to effect performance of the obligations undertaken in that compromise agreement. Essentially they promised to execute an attendant document. The "Act of Exchange" was that document. The form it took, a separate instrument and a recited exchange of parcels, with conveyance language, was no doubt influenced by at least *190 two considerations. One, there was need, for title purposes, to have the Chief Executive of the state, rather than simply the duly authorized attorney for the Louisiana Health and Human Resources Administration, sign on, relative to the compromise. And, two, an abundance of caution on the part of the notary public executing an act concerning real estate no doubt prompted the use of conveyance language in the companion document.
The transaction, evidenced by tandem instruments, was, nonetheless, a compromise. The transaction was not a sale. And it was not simply an exchange of properties. The constitutional prohibition relative to transfer of "mineral rights on property sold by the state" is therefore not applicable to a compromise, nor to an "exchange" which is part and parcel of, and the means chosen to effect, a compromise.
Unlike a sale or an exchange, a compromise does not entail a conveyance, or the conferring of new rights. As described by Planiol in his Treatise on the Civil Law,
"The compromise does not have the effect of conferring new rights on the parties, but only of recognizing those which they claim to have, and to consolidate them by protecting them from further litigation. It is therefore, not an act transferring rights, but purely an act in recognition, or declaratory, of such rights. Neither party (with respect to the rights recognized as theirs in the act) acquires the thing of the other, and does not, therefore, succeed to it; the parties merely kept what they already claimed to belong to them by obtaining the waiver of the other; but they do not acquire anything." (emphasis added)
2 M. Planiol, Treatise on the Civil Law pt. 2, no. 2295 (11th ed. La.St.L.Inst.Trans. 1959)
In this case there was a transfer and corresponding acquisition, but only with respect to the $75,000 cash given to American Lung by the state. With respect to the two land parcels and the titles thereto, it was, as Planiol notes above, purely an act in recognition or declaration of the original rights of the respective claimants, not an act transferring rights. Each party, in effect, "keeps on the thing a part of his own title." The following passage from Planiol makes this point, while at the same time discussing the compromise, which like this one and its cash inclusion, may contain translative clauses, but only relative to sums or things given as part of the compromise which are not included in the object in litigation:
In spite of the principle formulated under No. 2295, a compromise can contain translative clauses. The distinction is very easy to understand. Two persons dispute the ownership of a field: they agree to divide it half and half, no transferring effect results; as says M. Demante, "each keeps on the thing a part of his own title." But the compromise is not always made by dividing the object of the litigation. In the foregoing example the parties can agree that the whole field should remain in one of them, for a determined thing or sum of money which the other pays. This thing or this sum which is not included in the object in litigation comes from the patrimony of one of the parties and falls into that of the other. To that extent the contract really transfers, and the consequences which it produce[d] are inverse to those which are enumerated above; transcription [recordation] is necessary if the thing thus assigned is an immovable; the transcription can serve as a just title (Orleans, 23 Nov.1893), D.94.2.287, S.95.2.9), and the warranty is due to the person acquiring.
* * * * * *
The object of the transfer is only the thing or the sum promised and not a corresponding part of the object in dispute; the latter remains in its entirety with its possessor by virtue of the original title which he invoked before the compromise, and the thing or the sum which was stipulated should be considered as the price of the waiver obtained. (emphasis added)
2 M. Planiol, supra p. 13, pt. 2 at no. 2297 n. 6.
*191 We hold, therefore, that in this case there was a transaction or compromise, not a sale, nor an exchange of property, and that consequently La. Const. art. 9, § 4 does not affect the mineral interest in American Lung's 221.51 acres. Needless to say this constitutional interpretation is restricted to a good faith compromise of competing claims to real property. There can be no circumvention of Art. 9, § 4 by structuring as an exchange what is really a sale. Nor will a compromise not in good faith be permitted to escape the prohibition. And we have not addressed in this opinion whether a simple quitclaim by the state of interest in property offends, or is invalidated by, the constitutional reservation of minerals in lands sold by the state.[15]
An incidental matter needs addressing here. In addition to the Mineral Board's exception of no cause of action, the Mineral Board also filed an exception of no right of action based on American Lung's failure to obtain legislative authority to file suit against a state agency, as required by Art. 12, § 10.
Both the exception of no cause of action and the exception of no right of action were sustained in the district court. The court of appeal did not address the correctness of the ruling sustaining the exception of no right of action.
The district court's ruling sustaining the exception of no right of action is also overruled. The Legislature, by concurrent resolution No. 77 of 1985, authorized American Lung to file and/or continue suit against the state on matters arising out of the ownership of the Greenwell Springs property. Although that concurrent resolution was passed after the institution of this litigation in 1983 the resolution is to be given retroactive effect. Long v. Northeast Soil Conservation District of Louisiana, 226 La. 824, 77 So.2d 408 (1955).

Decree
For the foregoing reasons the judgments of the district court and the court of appeal are reversed. The exceptions of no cause of action and no right of action are overruled, and the case is remanded to the district court for further proceedings.
REVERSED AND REMANDED.
DENNIS, J., concurs with reasons.
MARCUS, J., dissents and assigns reasons.
WATSON, J., dissents and will assign reasons.
DENNIS, Justice, concurring.
I respectfully concur.
I agree with the majority that the constitutional requirement of a mineral reservation on property sold by the state was not intended to prevent the compromise and settlement of a lawsuit involving property claimed by the state. However, I have reservations as to whether the Civil Code and Planiol provisions should be applied to interpret this constitutional section.
MARCUS, Justice (dissenting).
Clearly, the mineral rights belonging to the state were alienated as a result of the compromise agreement and the act of exchange executed pursuant thereto. I consider this a violation of La. Const. art. 9, § 4. Accordingly, I respectfully dissent.
WATSON, Justice, dissenting.
In this dispute over ownership of mineral rights, the American Lung Association of Louisiana, Inc., seeks to enjoin the State Mineral Board from leasing minerals under land transferred by the state to the Associaton in a compromise act of exchange. The Association's suit also seeks to quiet its title to the land. The trial court sustained *192 the Mineral Board's exception of no cause of action under LSA-Const.1974, Art. 9, § 4[1] and/or no right of action under LSA-Const.1974, Art. 12, § 10.[2]
The issue here is whether the constitutional prohibition against sale of the state's mineral rights in Article 9, § 4(a) of the Louisiana Constitution of 1974 prohibits conveyance of the state's mineral rights in a compromise act of exchange.
At the time of the 1924 donation, the applicable law concerning alienation of state mineral interests by sale was found in Art. 4, § 2 of the Louisiana Constitution of 1921, which provided in pertinent part:
"In all cases the mineral rights on any and all property sold by the State shall be reserved, except where the owner or other person having the right to redeem may buy or redeem property sold or adjudicated to the State for taxes."
As there was no reservation of minerals in the Act of Donation to the Tuberculosis Commission, a state agency, the mineral rights of the property vested in the state.
When the land was donated to a state agency, it fell under the constitutional prohibition against alienating the mineral rights by sale, even though the Tuberculosis Commission was empowered to sell land in Act 92 of 1932.
In State ex rel Board of Commissioners of Tensas Basin Levee District v. Grace, 161 La. 1039, 109 So. 830 (1926), land transferred from the state to a levee district without reservation of minerals was not a prohibited alienation since the land stayed the property of the state. "The [levee] district could not sell it without reserving... the mineral rights, for the reason that its creator, ... could not do so." 109 So. 830 at 832. Even though the levee district was empowered to sell land it could not sell it with the minerals in contravention of the constitutional provision.
When the state acted in 1977 and 1978 to settle the Association's suit by returning part of the property originally donated to the state, the Association claims it also received ownership of the mineral rights. At the time of these transactions, the constitutional prohibition against alienation of state mineral rights by sale was found in Art. 9, § 4(A) of the Louisiana Constitution of 1974 which echoes the earlier provision and provides:
"The mineral rights on property sold by the state shall be reserved, except when the owner or person having the right to redeem buys or redeems property sold or adjudicated to the state for taxes."
Both the trial court and the court of appeal found that the agreements signified an exchange. The intent of the parties evidenced in the documents was to effect a conveyance by each party of a specific portion of the land. Exchange is defined in LSA-C.C. art. 2660 as "... a contract, by which the parties to the contract give to one another, one thing for another, whatever it be, except money; for in that case it would be a sale." An exchange is the legal equivalent of a sale. Womack v. Sternberg, 247 La. 566, 172 So.2d 683 (1965); *193 LSA-C.C. art. 2667.[3] Conveyance of mineral rights in an exchange is prohibited by Art. 9, § 4 of the Constitution.
The 1977 compromise and the 1978 act of exchange must be considered together as part and parcel of one agreement between the parties. Although the concepts of compromise and exchange are dissimilar, the circumstances explain the intent of the parties. The 1977 agreement is designed as a compromise and settlement contract. It mentions the case on appeal which the agreement settles (the state had won in the trial court!) and describes the planned exchange of property as a "mutual quitclaim". The agreement provides that the state, "subject to confirmation of this entire agreement by the Legislature ... hereby conveys, assigns and quitclaims all right, title or interest ..." in the described property. The Association "... agrees to convey, assign and quitclaim ..." further described property.
The majority holds that this agreement was a compromise under LSA-C.C. art. 3071.[4] However, a compromise is not the only aspect of the parties' intent. The compromise looks forward to further acts for its implementation. Its language is subject to confirmation and contemplates future acts. A compromise, to be valid, must be complete in and of itself. Lampkins v. Vicksburg, S & P.R. Co., 42 La.Ann. 997, 8 So. 530 (1890). This compromise was not complete in itself, as a mutual quitclaim. The two parties did not "draw a line" down the center of disputed property and give up rights but anticipated an act of exchange in a future conveyance.
The act of exchange provided a mutual exchange of property. LSA-C.C. art. 2660. Both the act of exchange and the earlier compromise contain conveyance language. The intention of the compromise was an exchange or sale of property, and any exchange or sale of the mineral rights along with the property is prohibited by Art. 9, § 4 of the 1974 Constitution.
Placing the agreement in the guise of a compromise did not take the conveyance outside the constitutional prohibition against sale of state mineral rights. Louisiana's constitutional prohibition manifests a strong public policy against alienation of the state's mineral resources. "There is a strong public policy in this state that control of public things should remain in the hands of the state, absent a clear and unambiguous intent to relinquish such control." State ex rel Guste v. Board of Commissioners of the Orleans Levee District, 456 So.2d 605 at 610 (La.1984). See also Gulf Oil Co. v. State Mineral Board, 317 So.2d 576 (La.1975).
The legislature cannot do that which is prohibited by the Constitution. Aguillard v. Treen, 440 So.2d 704 (La.1983). Act 959 of 1984 is therefore unconstitutional insofar as it sought to confirm conveyance of the state's minerals in this exchange of property. Because the conveyance here was an exchange, which has the legal effect of a sale, it comes under the prohibition of Art. 9, § 4. What the majority approves is exactly what was meant to be prohibited by the constitution.
Therefore, I respectfully dissent.
NOTES
[1] 1974 La. Const. Art. 9, § 4:

(A) Reservation of Mineral Rights. The mineral rights on property sold by the state shall be reserved, except when the owner or person having the right to redeem buys or redeems property sold or adjudicated to the state for taxes.
[2] "First: The Greenwell Springs Tract situated in the Parish of East Baton Rouge, State of Louisiana, being the eastern part of Section 49 and that part of Section 48, comprising within Letters "A", "M", "C", "E" in Township 5, South Range 2 East Greenburg District, Louisiana, containing one hundred sixty-one and 88/100 (161.88) acres east of Road and one hundred twenty-one and 51/100 (121.51) acres west of Road, making a total of Two hundred eighty-three and 38/100 (283.38 Acres), including Lot One of the Odom Subdivision made by M.P. Robinson in the year 1883, according to a survey and map by R. Swart, Parish Surveyor, dated August 26th, 1910 annexed to an act of sale before W. McL. Fayssoux, Notary Public for the Parish of Orleans, Louis P. Trenchard et als to John william Barkdull.

Except: A certain tract of parcel of land fronting on the Amite River containing about eleven and 62/100 (11.62) Acres or Thirteen and 23/100 (13.23) Arpents according to a plat and survey by Joseph Gorlinski dated January 3rd, 1855 and bounded by Greenwell Springs on the north, Amite River on the east, Burlington on South and the Baton Rouge and Greenwell Road on the West. Which property was claimed to be owned by the heirs of John M. Henshaw.
Second: Lot 16 of the Odom Tract situated in the Parish of East Baton Rouge, State of Louisiana, containing about One Hundred (100) acres. Being the same property acquired by donor from Greenwell Springs Water Company by act of sale before Wm. McL. Fayssoux, Notary Public for the Parish of Orleans, La. on January 10th, 1922." (Tr. pp. 25-26)
[3] The Greenwell Springs tract is divided by a north/south road. The section east of the road, on which the Greenwell Springs Hospital was built is comprised of 161.88 acres. The section west of the road is made up of 121.51 acres.
[4] Apparently either there has been a "confirmation of the entire agreement by the Legislature of the State of Louisiana in the regular session of 1977," or that confirmation is sufficiently made evident by 1) the $75,000 appropriation in 1977, 2) Act 959 of 1984 authorizing the State to "release and quitclaim unto the American Lung Association of La., Inc. all the interest of the state in and to the minerals and mineral rights in the 221.51 acres, and/or 3) concurrent resolution No. 77 of 1985 authorizing continuance of suit. In all events the limited reason for the court of appeal's dismissal of plaintiff's cause of action was La. Const. Art. 9, § 4's prohibiting the state's sale of mineral rights, the matter which is the subject of this opinion.
[5] That act, passed in 1984, was apparently a legislative repudiation of the state's assertion of claim to the minerals. It may also have been passed out of an abundance of caution because the compromise and exchange (in 1977 and 1978) had made no specific reference to mineral rights. However, there was no need for those documents, which reflected quitclaims and the validation of the parties' respective titles, to specify that mineral rights were included because absent an express reservation of the mineral rights bt the state, the mineral rights were included in the American Lung's 221.51 acres. The State's argument that it was unnecessary for it to expressly reserve the mineral rights because the mineral rights are reserved by effect of law is incorrect. The automatic reservation only occurs when the state's alienation of property comes within the meaning of Art. 9, § 4; the compromise that is the subject of the present suit was not such an alienation, as we determine in this opinion.
[6] The court of appeal in effect held that Act 959 of 1984 was unconstitutional.
[7] LSA-R.S. 30:125.
[8] La.Atty.Gen.Op. 83-800.
[9] Art. 4, § 2 of the 1921 constitution states in pertinent part:

In all cases the mineral rights on any and all property sold by the State shall be reserved, except where the owner or other person having the right to redeem may buy or redeem property sold or adjudicated to the State for taxes. This, however, shall not prevent the leasing of such lands and rights for mineral or other purposes.
Art. 9, § 4(A) of the 1974 constitution states: Reservation of Mineral Rights. The mineral rights on property sold by the state shall be reserved, except when the owner or person having the right to redeem buys or redeems property sold or adjudicated to the state for taxes.
[10] In Board of Commissioners of Caddo Levee District v. S.D. Hunter Foundation; 354 So.2d 156, 167 n. 8 (La.1977), the late Justice Tate stated:

The levee district asks us to overrule Hass as erroneously decided, an issue we do not reach.
It relies upon interpretations of La.Const. of 1921, Art. 4, Section 2, which prevents alienation after 1921 of state mineral interests. Decisions of this court have consistently held that, for purposes of this article, levee districts were a state agency, performing a state function and administering state lands; they were therefore subject to this provision preventing alienation after 1921 of mineral rights owned by the state. See, e.g., State ex rel. Board of Com'rs, etc. v. Grace, 161 La. 1039, 1044, 109 So. 830 (1926), and decisions which recognized alienations only because the effective date was prior to the 1921 constitutional bar: Lum Chow v. Board of Com'rs, etc., 203 La. 268, 13 So.2d 857 (1943); Schwing Lumber & Shingle Co., Inc. v. Board of Com'rs, etc., 200 La. 1049, 9 So.2d 409 (1942); Standard Oil Co. of Louisiana v. Allison, 196 La. 838, 200 So. 273 (1941); Barnett v. State Mineral Board, 193 La. 1055, 192 So. 701 (1939). See also: Yiannopoulos, 37 La.L.Rev. 317-18 (1977); Hardy, 24 La.L.Rev. 228-29 (1964); Note, 24 La.L.Rev. 416 (1964).
Accordingly, this constitutional prohibition of any alienation of mineral rights by the state after 1921, Lewis v. State, 244 La. 1039, 156 So.2d 431 (1963), likewise bars after 1921 divestiture through acquisitive prescription of a levee district's mineral interest in (state) lands owned by and administered by it. Shell Oil Co. v. Board of Com'rs of Pontchartrain Dist., 336 So.2d 248 (La.App. 1st Cir.1976), cert. denied 338 So.2d 1156 (La.1976) ("No errror of law."), Noted, 37 La.L.Rev. 317-18 (1977). (emphasis added).
[11] In Shell Oil Co. v. Board of Commissioners of Pontchartrain Levee District, 336 So.2d 248, 254 (La.App. 1st Cir.), writ denied, 338 So.2d 1156 (La.1976) the following was stated:

With respect to this contention we must hold that the subject Constitutional prohibition against the alienation of minerals by the state equally prohibits the acquisition of these minerals by others by the running of prescription against the state. Notwithstanding the fact that the Legislature has on numerous occasions provided for the running of prescription against the state, these statutes can not be construed to include mineral rights for neither the Legislature not (sic) the courts can permit what the Constitution itself prohibits. Shell Oil Co. v. Board of Commissioners of Pontchartrain Levee District, 336 So.2d 248, 254 (La.App. 1st Cir.), writ denied, 338 So.2d 1156 (La.1976). (emphasis added).
[12] See for example Schwing Lumber & Shingle Co. v. Bd. of Comm'rs of Atchafalaya Basin Levee Dist., 200 La. 1049, 19 So.2d 409 (La. 1942).
[13] See for example Haas v. Bd. of Comm'rs of Red River, Atchafalaya and Bayou Boeuf Levee Dist., 206 La. 378, 19 So.2d 173 (La.1944).
[14] See for example Sims v. State Mineral Bd., 219 La. 342, 53 So.2d 124 (La.1951). Both Art. 4, § 2 of the 1921 Constitution and Art. 9, § 4 of the 1974 Constitution allowed a former owner of land adjudicated to the state for taxes who redeems the land to be returned both the land and the mineral rights.
[15] Our holding in this case effectively quiets the title to real property not only with regard to American Lung and its 221.51 acres, but also to the State of Louisiana and its 161.88 acres, including Greenwell Springs Hospital. Were we to have held that the compromise effected a prohibited conveyance of state minerals, that entire compromise, including dismissal of the litigation in which American Lung sought title confirmation to the entire Greenwell Springs property, may well have had to be stricken, and American Lung's pursuit converted to renewal of its appeal from judgment in the 1975 litigation.
[1] LSA-Const.1974, Art. 9, § 4 provides:

"(A) Reservation of Mineral Rights. The mineral rights on property sold by the state shall be reserved, except when the owner or person having the right to redeem buys or redeems property sold or adjudicated to the state for taxes.
"(B) Prescription. Lands and mineral interests of the state, of a school board, or of a levee district shall not be lost by prescription."
[2] LSA-Const.1974, Art. 12, § 10 provides:

"(A) No Immunity in Contract and Tort. Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
"(B) Waiver in Other Suits. The legislature may authorize other suits against the state, a state agency, or a political subdivision. A measure authorizing suit shall waive immunity from suit and liability.
"(C) Procedure; Judgments. The legislature shall provide a procedure for suits against the state, a state agency, or a political subdivision. It shall provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which judgment is rendered."
[3] LSA-C.C. art. 2667 provides:

"All the other provisions relative to the contract of sale apply to the contract of exchange. "And in this last contract each of the parties is individually considered both as vendor and vendee."
[4] LSA-C.C. art. 3071 provides:

"A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
"This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form."