|2PARRO, Judge.
A true mineral owner sought to recover, among other things, bonus payments received by the State of Louisiana and the State Mineral Board (collectively referred to as “the State”) under leases of mineral rights eventually found not to belong to the State. The trial court awarded damages in favor of the true mineral owner in an amount equal to the bonuses received by the State under the State leases. The State appeals. This court reverses.

Facts and Procedural History

In 1924, The American Lung Association of Louisiana, Inc.’s (“American Lung”) predecessor donated land, comprising 371.77 acres, to the State without reserving the mineral rights, “for the location of sanatoria for persons suffering from tuberculosis.” A *1220 hospital was built on a portion of this property. With the passage of time, the State began to use this facility for other purposes. Since the express donative purpose was not being complied with, American Lung filed suit against the State in 1975 to revoke the donation and recover all of the donated property. The parties ultimately settled this dispute. Under the terms of their settlement, American Lung received 221.51 acres of the 371.77 acres originally donated in addition to a sum of money, and the State retained the remaining acreage. The acreage returned to American Lung through this settlement, which is at issue in this case, will be referred to as the Greenwell Springs tract.
In 1977, the parties executed a “Compromise Agreement” which expressly set forth their agreement pertaining to the above dispute. Afterwards, the parties executed an “Act of Exchange” which transferred the tracts of land to the respective parties in accordance with their compromise agreement. Neither notarial document made provision for the reservation of minerals in favor of either party.
In October of 1979, American Lung executed a five-year mineral lease, being a full warranty lease, on the Greenwell Springs tract in favor of Alton C. Schultz, Jr. The lease was duly recorded in the conveyance records of East Baton Rouge Parish. On October 15, 1979, American Lung received bonuses in the amount of $166,132.50. After-ward |3it received annual delay rentals in the amount of $83,066.25 for 4 years.[1] Schultz assigned the lease to Martin Exploration Company on September 22, 1981.
On July 22, 1983, a lease-purchase title opinion, rendered by W. Miguel Swanwick at the request of Callón Petroleum Company, revealed that “[b]ased on the authorities cited hereinbelow, it is our opinion that there is an excellent chance that a judicial determination of the ownership of the minerals on and under the subject tract would favor the State of Louisiana.” However, Swanwick indicated that he was not “in a position to say that the State of Louisiana or The American Lung Association of Louisiana, Inc. would be declared the owner of the minerals on and under the subject tract.” His opinion further provided:
We believe that the State of Louisiana has the better claim, but in light of the uncertainty surrounding the matter, we recommend that you purchase the subject lease from Martin Exploration Company and nominate the subject tract for bid with the State of Louisiana, making an effort to have escrowed the purchase price to be paid to Martin and the delay rental payment due on October 12, 1983, to The American Lung Association of Louisiana, Inc.
In August of 1983, the State Mineral Board (“Mineral Board”) received from a private party an indication of interest in the State’s right to the minerals in the Greenwell Springs tract. The Mineral Board advertised the Greenwell Springs tract publicly for mineral leasing. When American Lung protested, the Mineral Board requested and received an opinion (dated October 13, 1983) from the Louisiana Attorney General that the mineral rights in the Greenwell Springs tract belonged to the State. On the strength of that opinion, the Mineral Board once again publicly advertised this acreage for mineral leasing.
On November 23, 1983, American Lung filed a petition to quiet its title to these minerals and to enjoin the State from leasing the minerals on the Greenwell Springs tract. The State received personal service of this petition on December 8, 1983. By consent of the parties, a preliminary injunction was read into the minutes of the court on December 16, 1983, which restrained and enjoined the State or its lessees from any surface activity on the Greenwell Springs tract and from any directional drilling of minerals under this tract |4pending resolution of the November, 1983 suit.[2] However, in accordance with the consent injunction, the right of the State to execute mineral leases affecting the *1221 subject tract was impliedly recognized. The Mineral Board issued a notice to all prospective bidders informing them of the pending lawsuit by American Lung regarding the ownership of the minerals and of the preliminary injunction enjoining the State from using the surface of the Greenwell Springs tract and from directional drilling under this tract without consent of the parties.
Subsequently, during the pendency of the November, 1983 suit, the State executed mineral leases on January 11, 1984 in favor of the following three parties: (1) Callon Petroleum Company (“Callón”), (2) Clayton W. Williams, Jr., and (3) Kenneth S. Hill Properties, Inc. As a result of these three leases, the State received a total of $244,569.31 in bonus and rental payments. Although these leases had a three-year term, the lessees allowed them to terminate after the first year (on January 11, 1985).
On September 18, 1984, one of the assignees of American Lung’s lease requested that it be granted a one-year extension of the primary term of the October, 1979 lease free of charge since American Lung’s November, 1983 suit rendered the lease non-merchantable.[3] American Lung refused this request. Therefore, the American Lung lease expired under its original terms on October 12,1984.[4]
In 1987, the supreme court ultimately concluded that the minerals under the surface of the Greenwell Springs tract belonged to American Lung, thus resolving the dispute underlying the November, 1983 suit. American Lung Association of Louisiana, Inc. v. State Mineral Board, 507 So.2d 184, 191 (La.1987). With the resolution of the mineral ownership in its favor, American Lung instituted the ease sub judice by filing a claim for damages for unlawful and tortious interference with its immovable property and |5rights in its immovable property, or in the alternative, unjust enrichment by a bad faith possessor. American Lung sought to recover $244,569.31 in damages plus attorney’s fees. After a trial on the merits, the trial-court found that the State was in bad faith when it executed the January, 1984 mineral leases based on the definitions found in LSA-C.C. arts. 486 and 487 and that as a bad faith possessor, the State was bound to restore the fruits, i.e., the bonus and rental payments, of $244,569.31.[5] The trial court entered judgment in favor of American Lung in the sum of $244,569.31 together with interest from January 11, 1984 until paid, and costs.
The State appeals, setting forth several assignments of error which raise the issue of whether the mineral code or the civil code should govern the rights and obligations of the parties in this case.

Standard of Review

A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding which is manifestly erroneous or clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882, n. 2 (La. 1993). Before an appellate court may reverse a factfinder’s determinations, it must find from the record that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong (manifestly erroneous). Id. at 882; See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).

Analysis

The legislature has enacted a mineral code to govern disputes concerning mineral rights. The Louisiana Mineral Code is a specialized extension of the Louisiana Civil Code. LSA-R.S. 31:2, comment. Where the Mineral Code neither expressly nor impliedly provides for a particular situation, resort is made to the Civil Code or other laws, either *1222 directly or by appropriate analogy. LSA-R.S. 31:2.[6] However, where there is conflict |6between the Mineral Code and the provisions of the Civil Code or other laws, the Mineral Code prevails. LSA-R.S. 31:2. See, e.g., Frey v. Amoco Production Company, 603 So.2d 166, 171 (La.1992); Producers Oil & Gas Company v. Nix, 488 So.2d 1099,1103 (La.App. 2nd Cir.), writ denied, 493 So.2d 641 (La.1986); John M. McCollam, A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code, 50 Tul.L.Rev. 729, 733, n. 426 (1976).
We begin our analysis by determining whether the Mineral Code expressly or impliedly provides for the particular situation of this ease, namely, the legal effect of the execution of a protective lease on the rights of the lessor and the lessee.
Regarding the rights of a mineral lessee, the Mineral Code specifically authorizes a mineral lessee to take leases from persons claiming the leased land or mineral rights or interests therein adversely to his lessor. LSA-R.S. 31:121. This provision was incorporated into the Mineral Code to enable a mineral lessee to protect its right to explore for and produce minerals. However, a mineral lessor has the power to take this statutory right away from its lessee by incorporating a lease provision which specifically prohibits or limits the lessee’s right to take such protective leases. LSA-R.S. 31:3. But in the absence of a contractual limitation, Article 121 simply addresses the rights of a mineral lessee. In this regard, although the Mineral Code authorizes the taking of mineral leases from adverse claimants, the code has further made it clear that a mineral lessee is not without recourse against a non-owner, mineral lessor. See LSA-R.S. 31:120; McCollam, A Primer for the Practice of Mineral Lazo, 50 Tul.L.Rev. at 798-799. Under LSA-R.S. 31:119, a mineral lessor is bound to deliver the leased premises for use by the lessee as contemplated by the lease document, to refrain from disturbing the lessee’s possession, and to perform the lease contract in good faith. A mineral lessor impliedly warrants title to the interest leased unless such warranty is expressly excluded or limited. The liability of the lessor to the lessee for breach of warranty is limited to recovery of |7money paid or other property or its value given to the lessor for execution or maintenance of the lease and any royalties delivered on production from the lease. LSA-R.S. 31:120.
In other words, the true owner, mineral lessor’s failure to expressly prohibit the taking of protective leases may result in a warranty action by the lessee against the non-owner lessor, even before he is evicted from possession. See LSA-R.S. 31:120. Fredrick W. Ellis, The Work of the Louisiana Appellate Courts for the 1976-1977 Term, 38 La. L.R. 313, 381 (1978). In an action for breach of warranty, the lessee would be entitled to recover all bonus money, rentals, and royalties paid the non-owner lessor, but cannot hold him liable for additional damages. McCollam, A Primer for the Practice of Mineral Law, 50 Tul.L.Rev. at 799. Any further losses sustained beyond bonus, rental, and royalty payments are to be borne by the mineral lessee since such losses are considered to be an industrial risk of doing business which can be spread to consumers as a cost of the mineral products consumed. LSA-R.S. 31:120, comment.
In light of the above discussion, it is obvious that if you grant the lessee a right to enter into protective leases with a corresponding right to recover certain of his advances if there is a breach of warranty by the lessor of the protective lease, then the Mineral Code is impliedly authorizing the lease of mineral rights actually owned by another person. Thus, if such implied authority is given by the Mineral Code, it cannot be said that the non-owner lessor who enters into such a protective lease pursuant to this authority is, at the same time, guilty of a *1223 violation of the rights of the true owner of the minerals. This would be tantamount to the setting of a legal trap to the unwary by the legislature, and obviously against public policy to permit such a consequence.
To interpret the Mineral Code in any other manner would subject the non-owner lessor, who enters into a mineral lease to protect the interests of the lessee, to double liability. It would be absurd to think that both American Lung (as true owner) and the State’s lessees would each be able to recover the amounts received by the State as bonus money and rentals. Such a finding would defeat the policy considerations underlying the enactment of article 121 of the Mineral Code, which facilitates the exploration and production of minerals by a lessee.
IgBased on our conclusion that the Mineral Code impliedly provides for the particular situation presented by the facts of this case, there is no need for this court to resort to the Louisiana Civil Code for resolution of this case because the provisions of the Mineral Code shall prevail. We believe that such a solution is “just, legal and proper” in this case under the vagaries of the law and particular circumstances and facts of this case. LSA-C.C.P. art. 2164.
Regarding the issue of possession, although the trial court found the State to be in bad faith for the purposes of LSA-C.C. art. 487 by executing mineral leases following the filing of a lawsuit against it by American Lung, there was no finding that the State was ever in “possession” of anything. The mere execution of a mineral lease is not possession, especially since there was never any attempt to explore for or capture any of the minerals on the subject tract. American Lung argues that the recordation of the State’s leases was a disturbance in law of its possession. It may be true that the recordation of the State leases “disturbed” the possession of American Lung, but the disturbance in law of one’s possession is not the equivalent of “possession” by another. Therefore, since the State was never in possession of American Lung’s mineral estate, the trial court erred in applying LSA-C.C. art. 487 to the facts of this case.
Moreover, with regard to the coexistence of the State leases and the American Lung lease, this court notes that both the State and American Lung received bonus and/or rental payments under their respective leases for the period of January 11,1984 through October 12, 1984. There exists a period of approximately three months (October 12, 1984 through January 11, 1985) during which the State received a bonus payment for which American Lung did not derive any lease income. American Lung argues that the State deprived it of receiving bonus and/or rental payments that it would have otherwise received as the true owner of the minerals. The record does not substantiate this argument. As pointed out by the trial court, the evidence showed that the lack of drilling success in 1984, combined with the down-turn of the industry prices for the product, were the reasons for no new development with regard to leasing and drilling.
|9Decree
For the foregoing reasons, the judgment of the trial court is reversed. Costs of this appeal are assessed to American Lung.
REVERSED.

. American Lung received delay rentals in the amount of $83,066.25 on the following dates: October 1, 1980, September 21, 1981, October 15, 1982, and October 12, 1983.

. The actual judgment of preliminary injunction was signed on January 24, 1984.

. On January 25, 1984, Martin Exploration Company assigned American Lung’s lease to G & H Petroleum, Inc. who on January 30, 1984 assigned these lease rights to Callón.

. It is interesting to note that Martin Exploration Company (a lessee by assignment of the October 15, 1979 American Lung lease) had filed suit on April 23, 1985, against American Lung to recover bonuses and rentals, totaling $498,397.50, paid to American Lung under the October, 1979 mineral lease.

.The trial court noted in its written reasons for judgment that the nature of the State's mineral leases, i.e., whether protective or not, was irrelevant.

. LSA-R.S. 31:2 provides:
The provisions of this Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law. In the event of conflict between the provisions of this Code and those of the Civil Code or other laws the provisions of this Code shall prevail. If this Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable.