**PRAIRIE PRODUCING COMPANY
and Prairie Holding Company,
Appellants,**

v.

**ANGELINA HARDWOOD LUMBER
COMPANY, Appellee.**

No. 09–93–184 CV.

Court of Appeals of Texas,
Beaumont.

Aug. 25, 1994.

Rehearing Overruled Oct. 13, 1994.

Marie R. Yeates, Vinson & Elkins, Houston, Gilbert I. Low, Orgain, Bell & Tucker, Beaumont, M. Scott Taylor, Lufkin, Robert E. Meadows, Sewell & Riggs, Harry M. Reasoner, Vinson & Elkins, Houston, for appellants.

Kenzy D. Hallmark, Lufkin, Dewey J. Gonsoulin, Mehaffy & Weber, Beaumont, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This appeal results from a judgment entered upon jury verdict in favor of plaintiff, now appellee, Angelina Hardwood Lumber Company, against defendants, now appellants, Prairie Producing Company and Prairie Holding Company, for the sum of $78,954,066.56, including pre-judgment interest. It is from this judgment that appellants make their appeal. In this opinion we shall refer to Angelina Hardwood Lumber Company as "Angelina" or appellee. Prairie Producing Company and Prairie Holding Company shall be referred to as "Prairie" or appellants.

·In the underlying lawsuit appellee sought to recover actual and punitive damages for fraud committed by appellants to induce appellee to enter into an oil and gas lease contract. The case was tried to a jury in Angelina County, Texas, which found that Prairie was guilty of fraud and that it failed to perform its leases with Angelina in good faith. The jury awarded approximately $24 million in actual damages and $50 million in punitive damages.

Factually, on November 13, 1975, Angelina purchased from various members of the Hankamer family (hereinafter referred to as "Hankamers") title to a certain tract of land in Calcasieu Parish, Louisiana, adjacent to the Sabine River, comprising approximately 6,000 acres. When this sale was consummated, the Hankamers reserve the right to own all of the oil, gas and other minerals under the land which we shall refer to às the Hankamer mineral servitude. Under Louisiana law, which determines the ownership of minerals underlying Louisiana real property, the reservation of a mineral servitude in a conveyance of the surface interest is effective for only ten years unless the mineral servitude owner conducts good faith operations for the discovery and production of minerals within the ten-year time period.

On November 12, 1985, just within this ten-year period, the Rio Bravo Well was drilled on the property and was completed as a dry hole in December 1985. Under Louisiana law, such drilling extended the Hankamers' mineral servitude on all land contiguous to the Rio Bravo Well for another ten-year period.

On April 30, 1987 and October 30, 1987, Prairie obtained two oil, gas and mineral leases from Hankamers on the land purchased by Angelina. On September 16, 1988, Prairie drilled the Prairie–Hankamer No. 1 Well east of Long Slough, approximately 1¼ miles northwest of the Rio Bravo Well. On November 6, 1988, Prairie drilled the Prairie–Hankamer No. 2 Well east of Long Slough but bottomed west of Long Slough.

Since the State of Louisiana owns the minerals under navigable streams, if such a streambed crossed the Hankamers' mineral servitude, then the servitude would prescribe or terminate on the lands on the other side of the stream. In the State of Louisiana, a navigable stream is one which in 1812, when Louisiana joined the Union, was used or was capable of being used in commerce such as fishing, trapping, or transporting logs to market.

The property involved is in the floodplain of the Sabine River and is obviously laced with streams. The Prairie–Hankamer No. 1 Well was a major producer and was the first well in what came to be called the West Starks Field. The Prairie–Hankamer No. 2 Well which bottomed west of Long Slough presented a potential problem between Prairie and Angelina's interest, for if Angelina owned any minerals which were extracted by Prairie without a lease from Angelina, Prairie would have to pay Angelina all of the production, i.e., eight eighths, instead of a fractional royalty interest.

In April 1989, Prairie initiated lease negotiations with Angelina by sending its landman, Larry Bryan, to meet with George Henderson, President of Angelina. Angelina is a Subchapter S Corporation with its offices in Lufkin, Texas, and is owned by George Henderson, his children, his sister, his nephew, and a friend. Prior to this meeting, Bryan had sent a letter to Henderson offering on behalf of Prairie to pay a bonus of $50 an acre and a royalty of 3/16 to Angelina as an incentive to sign a lease. These negotiations were later concluded at a meeting in Shreveport, Louisiana, on June 16, 1989, between George Henderson and his attorneys, Don Weiss and Susie Morgan, acting for Angelina, and Bob Cabes, a Louisiana attorney, and Bill Bishop, acting for Prairie. Initially, Henderson asked for a 25% royalty but was advised by Cabes that the Hankamers only had a 20% royalty and that although Prairie could give Henderson a 25% royalty, but so doing would affect Prairie's neutrality. It is appellee's contention that Henderson agreed to duplicate the Hankamer royalties in order to gain Prairie's neutrality in any title dispute with the Hankamers. Prairie's

neutrality position was set out by a letter from Cabes to Weiss on June 21, 1989, which provided in part:

... it is Prairie's intention to remain neutral in the dispute between Angelina and the Hankamers and to share any information available to Prairie equally to both lessors.

Angelina contends that it would not have entered a lease agreement with Prairie without Prairie's promise to remain neutral. Along with this agreement to be neutral, Prairie agreed to suspend the payments of royalties to the Hankamers and to interplead the suspended royalties into court in a Louisiana concursus proceeding, (similar to an interpleader in the State of Texas) unless Angelina and the Hankamers agreed on an extra-judicial escrow arrangement.

Angelina says that in reliance upon Prairie's promises, Angelina executed two leases with Prairie on June 24, 1989. These leases however, did not resolve potential problems between Prairie and Angelina in that since these leases were dated effective June 1, 1989, and Prairie had been producing and selling minerals from the West Starks Field since November 1988, the leases, prospective in nature, did not resolve the problem regarding previously extracted minerals which Angelina could show that it owned. These lease agreements did nevertheless, minimize future production problems between Prairie and Angelina.

The acreage claimed by Angelina, the property subject to these lease agreements, was that property west of Long Slough. Angelina agreed for Prairie to calculate the bonus for the leases using only the 1,250 acres west of Long Slough. Prairie had initially offered to pay a bonus of $250 per acre, however, the ultimate agreement as to bonus was $500 per acre, an amount being tied to Angelina's estimate of litigating potential title disputes. Angelina also negotiated rental payments of $250 per acre, substantially higher than the $50 per acre paid to the Hankamers. Prairie thus paid Angelina a total of $830,000 in bonus and rental. Following these negotiations and agreements, Angelina's attorney, Don Weiss, drafted the protective leases using Louisiana mineral

lease forms and the lease descriptions contained in a June 21, 1989 letter agreement. These leases did not mention neutrality on the part of Prairie. In this June 21, 1989 letter agreement, Angelina agreed that it was appropriate for Prairie to continue to pay royalties to the Hankamers on the area east of Long Slough. It was agreed by Angelina that Prairie would suspend, (i.e., escrow for later distribution upon resolution of title dispute) royalties on acreage west of Long Slough, but would continue to pay royalties to the Hankamers for those minerals located on acreage east of Long Slough. In December 1989, the Hankamers filed suit against Prairie, the State of Louisiana, and Angelina in state court in Calcasieu Parish, Louisiana, where the minerals were located, in order to resolve title to those minerals. That suit was later converted into an interpleader (concursus) proceeding.

On January 3, 1990, Angelina's lawyer, Susie Morgan, directed a letter to lawyer Cabes with copy to lawyer Jumonville and others, proposing that for purposes of dividing the royalties to be suspended (escrowed) versus the royalties that Prairie could continue to pay Hankamers, Long Slough should be deemed to be located where shown on the 1936 USGS quadrangle map. This letter was a proposed agreement by Angelina to assume that the eastern most body of navigable water is Long Slough. Further, that in the event the parties agreed to this approach, Prairie would suspend everything west of Long Slough as it appeared on that 1936 USGS quadrangle map.

Angelina adhered to this agreement with the understanding that should it later be determined that Angelina owned any minerals east of Long Slough, Angelina would seek recoupment of royalties attributable to those minerals from the Hankamers and not from Prairie. Susie Morgan's letter on behalf of Angelina provided in part:

> In case the court decides that there is a navigable body of water farther east than Long Slough as it is shown on the 1936 quad map, we will reserve our right to recover any additional revenue owed to Angelina Hardwood Lumber Company from the Hankamers.

The Hankamers, through their lawyer Jumonville, accepted lawyer Morgan's offer by letter dated January 12, 1990. This letter provided in part:

> [F]or purposes of the payment of lessors' royalty under the terms of the Hankamer lease and the proposed Escrow Agreement, the disputed acreage are those lands situated west of Long Slough as depicted on the 1936 USGS quadrangle map. Thus, royalty on those portions of the Hankamer mineral servitude lying east of that location should be paid to the Hankamers, irrespective of the above referenced [Louisiana] litigation.

In mid-January 1990, Angelina took a change in its position despite these prior agreements. Lawyer Morgan informed Prairie on January 19, 1990, that Angelina had changed its position and now demanded that Prairie escrow or suspend 100% of the royalties as opposed to escrowing or suspending only those royalties for acreage west of Long Slough. Angelina further positioned that if Prairie continued to pay any royalties whatsoever to the Hankamers that Angelina would look to Prairie, as opposed to the Hankamers, for reimbursement of all royalties to Angelina. According to lawyer Morgan's testimony at trial, Angelina changed its position based on a conversation Morgan had following a deposition taken in the Louisiana title suit of a local Louisiana resident, R.L. Hollie. Lawyer Morgan claimed that her conversation with Hollie indicated that Hog Slough was navigable, which, if true would mean that the Rio Bravo Well would be cut off from all Prairie Production areas and that Angelina would own 100% of the minerals.

The Hankamers viewed this change of position by Angelina as violative of its prior agreement concerning what portion of the royalties would be escrowed. They further viewed Angelina's new claim to ownership of 100% of the minerals, based on lawyer Morgan's alleged conversation with Hollie, as frivolous. Hollie never mentioned Hog Slough in his deposition. Furthermore, in affidavits made at the time of Prairie's initial investigation of the sloughs, Hollie denied the existence of any navigable slough in the area.

The Hankamer leases, unlike the lumber company leases, obligated Prairie to pay all royalties to the Hankamers unless a bona fide dispute existed as to the ownership of the minerals. Lawyer Morgan was aware of the "bona fide dispute" clause in the Hankamer leases and also knew that the clause gave Prairie only 30 days in which to determine if there was a bona fide dispute. In response to lawyer Cabes' January 23, 1990 request, lawyer Morgan refused to provide any additional evidence supportive of Angelina's change in position claiming 100% of the minerals, contending that her information was privileged due to the continuing Louisiana title dispute.

Now, Prairie was faced with the dilemma of complying with the conflicting demands of two lessors. The Hankamers demanded royalty payments pursuant to the earlier agreement or the Hankamers would pursue cancellation of Prairie's leases for failure to pay royalties in the absence of a bona fide title dispute. To the contrary, Angelina demanded that Prairie escrow 100% of the royalties.

Prairie capitulated to the demands of Angelina and escrowed 100% of the royalties. Prairie also took seriously the Hankamers threat to cancel their leases on the ground that there was no bona fide basis for Angelina's claim to the 100% of minerals. Prairie was then faced with the risk that a court might agree with the Hankamers that no bona fide title dispute existed for the entire 100% of minerals which might result in Prairie's loss of its several million dollar investment in wells drilled on the property. Prairie, in an effort to pacify the Hankamers and prevent lease cancellations, entered into a Minimum Royalty Agreement ("MRA") with the Hankamers whereby Prairie would pay the Hankamers $60,000 per month to be recouped by Prairie from any funds recovered by the Hankamers in the Louisiana lawsuit.

At trial, Angelina portrayed this MRA as a "secret agreement." Evidence at trial revealed that the day lawyer Cabes received the Hankamers' lease cancellation threat, Cabes notified lawyer Morgan. Again, on February 5, 1990, being the same day that Prairie and the Hankamers reached an agreement on the basic terms of the MRA, lawyer Cabes wrote lawyer Morgan notifying Angelina of Prairie's intent to enter into this MRA. Cabes further advised Angelina that since the MRA terms provided recoupment by Prairie from funds recovered by the Hankamers in the Louisiana lawsuit, Prairie now had an economic interest in the outcome of that dispute. In that letter, lawyer Cabes further stated that Prairie would continue its position of neutrality in the title dispute and that Prairie "still intend[s] to cooperate with both parties with regard to the investigation [of that dispute]."

In April 1990, the Hankamers sued Angelina and George Henderson in Harris County, Texas. Prairie was not a party to that lawsuit. In the Harris County lawsuit, the Hankamers alleged that Angelina and Henderson tortiously interfered with the Hankamers' leases with Prairie by reneging on the agreement for Prairie to split the royalties between the Hankamers and the escrow account. Prairie positions that it was never a party to the Harris County suit and had no knowledge of the suit before it was filed. It is Prairie's position that in retaliation for the Hankamers filing its Harris County lawsuit, Angelina filed the present action in Angelina County against both the Hankamers and Prairie.

Approximately one week prior to trial in the Louisiana title lawsuit, Angelina agreed to settle all its disputes with the Hankamers. Our record reflects that at the time of this settlement, Angelina had spent approximately one million dollars preparing for litigation and was ready for trial. This settlement agreement effectively provided that the Hankamers owned two-thirds of the minerals and that Angelina owned one-third of the minerals. According to the record, settlement was reached after some rather intense and detailed depositions of experts regarding navigability of certain streams. One of these experts, Dr. Gagliano, testifying at trial stated that he "assume[d] that the decision [to settle] was based upon the presentations that were made by the expert witnesses." Mr. George Henderson himself, testified that he recognized that Angelina did not have a lock on winning the title dispute and described

the settlement as an opportunity to avoid the risk of trial.

The Louisiana Court dismissed the title dispute action (interpleader) based upon this settlement agreement. The Hankamers and Angelina dismissed their claims against each other in the Harris County and Angelina County lawsuits. Angelina proceeded to trial in the Angelina case against Prairie only.

Angelina assured both Prairie and the Angelina trial court that it was not going to retry the issues of navigability and ownership of the Louisiana minerals which were settled in the Louisiana action. It is Prairie's position that contrary to those representations, Angelina sought and obtained damages specifically based on the jury's finding that, prior to the Louisiana settlement, Angelina owned 100% of the minerals and, by virtue of the settlement, sustained $22,835,-000 in damages, the value of the two-thirds mineral interest that the lumber company had recognized the Hankamers owned in the Louisiana settlement. The Angelina County jury also awarded Angelina, as further actual damages, $223,361.71 for attorneys' fees and expenses in the Harris County lawsuit, even though Prairie was not a party and had no advance knowledge of that suit. In a third actual damage finding, the jury awarded Angelina $400,000 in expert fees that Angelina had paid Dr. Gagliano in the Louisiana title lawsuit.

The jury's findings of these damages were based upon: (1) the commission of fraud by Prairie under the Texas Fraud and Real Estate Transaction Statute, TEX.BUS. & COM. CODE § 27.01 (Vernon 1987) the alleged fraud resulting from Prairie's failure to remain neutral in the Louisiana title lawsuit, when at the time Prairie made its promise of neutrality, Prairie had no intentions of remaining neutral in the Louisiana suit; and (2) Prairie's failure to perform its leases with Angelina in good faith.

Prairie objected to the trial court's applying the Texas Real Estate Fraud Statute to Prairie's so-called fraudulent promise of neutrality, where such neutrality promise was made in Louisiana, the real estate in question being located in Louisiana, and the neutrality promise being related to a title suit pending in Louisiana State Court.

■ The bottom line is that our trial court submitted parts of this case to the jury under Texas law and part of this case being submitted under Louisiana law. There is no duty of good faith in an oil and gas lease under Texas law. *Federal Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706, 708–709 (Tex.1990) (absent express contractual language, duty of good faith arises only in special relationships of shared trusts or unbalanced bargaining power); *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 544 (Tex.App.—Corpus Christi 1989, writ denied) (no special relationship arises between oil and gas lessor and lessee).

Through appellee's prevailing upon the trial court to apply the Texas Real Estate Fraud Statute, Angelina was then allowed to circumvent the Louisiana laws prohibition against attorneys' fees and punitive damages. The jury awarded Angelina attorneys' fees incurred in this Angelina County lawsuit in the sum of $463,500 predicated on the breach of good faith finding, submitted under Louisiana law, which prohibits attorneys' fees, and predicated on the fraud finding, submitted under Texas law but which should have been submitted under Louisiana law.

■ Appellants bring to this Court thirteen points of error. We elect to address appellants' point of error six at the outset. Appellants contend that the damages issue submitted in Jury Question No. 4A, required the jury to determine title to Louisiana minerals, a matter that the Texas trial court had no jurisdiction to decide. Further, that the trial court erred in overruling appellants' objections to the charge and appellants' postverdict motions.

Jury Question No. 4 reads:

If you have answered Question No. 1 or 3 "Yes", then answer Question No. 4. Otherwise, do not answer Question No. 4.

QUESTION NO. 4

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Angelina Hardwood Lumber Company for its actual damages, if any, that were proximately caused by Prairie Producing Company's conduct which you

found in your answer to Question No. 1 or Question No. 3?

Do not include any amount for interest on past damages, if any.

Do not include within your answer to this Question any amount for consequences which Angelina Hardwood Lumber Company could have avoided by acting with reasonable care and diligence.

Answer in dollars and cents for each of the following, if any:

A. The difference between the value of Angelina Hardwood Lumber Company's mineral interest under the settlement with the Hankamers, and the value of such mineral interest, if any, but for the conduct of Prairie Producing Company, if any, you have found.

Do not consider any interest, bonus, or delay rentals in arriving at your answer.

Answer: $ 22,835,000.00

B. Reasonable and necessary attorneys fees and expenses, if any, incurred in the Houston (Harris County) litigation.

Answer: $ 223,361.73

C. Additional expenses, if any, of Dr. Gagliano incurred in the Louisiana title litigation.

Answer: $ 400,000.00

Appellants contend at the outset that the jury's answer to Question 4A requires Prairie to pay the same royalties twice. Appellee denies that the jury's verdict has such an effect. Angelina obtained Prairie's acquiescence in a settlement of the Louisiana title lawsuit which recognized Angelina as owner of one-third of the minerals and the Hankamers as owners of two-thirds of such minerals. The result of that Louisiana settlement agreement required Prairie to pay to the Hankamers two-thirds of the royalties. It was after this Louisiana lawsuit settlement that Angelina claimed for the first time that its damages consisted of the value of the minerals that Angelina agreed were owned by the Hankamers. The jury verdict in this case requires Prairie to pay the same two-thirds royalties ($22,835,000) that Prairie is already obligated to pay to the Hankamers under the Louisiana settlement. It is clear to this Court that the settlement of the Loui-

siana lawsuit forever foreclosed Angelina's chances of owning more than one-third of the mineral interest unless same was purchased from the Hankamers. Angelina is now attempting to accomplish through a Texas court what it chose not to seek in the Louisiana court. We agree with appellants that should the jury's answer to Question 4A stand, Prairie will in fact pay twice for a two-thirds royalty interest. The jury's answer in Question 4A allows Angelina to recoup that which it forfeited through settlement of the Louisiana dispute.

Question 4A instructs the jury to find the difference between the value of Angelina's mineral interest under the settlement with the Hankamers, and the value of such mineral interest, if any, but for the conduct of Prairie. It is undisputed that the value of Angelina's mineral interest under the settlement was a one-third mineral interest, thus, the only issue for resolution in Question 4A was how much more the "value" of that mineral interest would have been "but for the conduct of Prairie...." The jury's answer reflects the conclusion that had Angelina proceeded with the Louisiana lawsuit, Angelina would have been adjudged the owner of all three-thirds of the minerals. The jury was instructed to determine the "difference" between "the value of [Angelina's] mineral interest under the settlement with the Hankamers" and "the value of such mineral interest, if any, but for the conduct of Prairie," i.e., ⅔ minus ⅓ equal ⅓ ($22,835,000). The jury was instructed to base damages on the value of Angelina's mineral interest before and after settlement. Angelina now contends that in Question 4A the jury was "not asked to determine the value of [Angelina's] mineral interest before and after settlement." In opening argument, counsel for Angelina argued:

[Y]ou're going to determine the difference in value of [the Lumber Company's] mineral interests *before* the settlement and *after* they did what they did.... If you believe that they would have won 100 percent and the judge would have awarded them 100 percent of this over in Louisiana, the value of that was calculated by Mr. Coutret at some 25 million dollars. (emphasis added).

On appeal, appellee seeks a different posturing of its position at trial and to the jury's answer in response to that position. In effect, the jury was asked to determine how much more of the mineral interest (royalties or title) Angelina would have received as a result of the Louisiana title dispute but for Prairie's conduct. ·We cannot escape the conclusion that this Angelina County jury was required to go behind the settlement agreement entered into by and between Angelina and the Hankamers. A Texas jury cannot do indirectly what the law prohibits it from doing directly, i.e., a jury cannot award damages based upon its own determination of title to foreign realty. *See Hartman .v. Sirgo Operating, Inc.,* 863 S.W.2d 764, 766 (Tex.App.—El Paso 1993, writ requested) citing *Holt v. Guerguin,* 106 Tex. 185, 163 S.W. 10 (1914).

Even though Angelina makes somewhat of a protest that the jury's damage award in Question 4A is not necessarily based on how much mineral interest Angelina was forced to give up in the Louisiana settlement, their position now on appeal is somewhat varying. Angelina's appellate position is:

But for Prairie's conduct, Angelina would have been able to establish its claim to a much greater share of the minerals that [sic] it ultimately settled for.

Angelina ... made the best deal available in the circumstances Prairie's fraud had created.

The Hankamers would settle only after Angelina ceded the Hankamers two-thirds of the minerals....

Prairie, through its funding of the Hankamers, had laid the necessary ground work to require Angelina to accept any offer presented to it.

If the jury in the present case believed that Angelina did not have a valid claim to any of the minerals, or that Prairie had not harmed Angelina's ability to present that claim, the jury would have answered "zero" in response to Question 4 A.

Angelina's damages were primarily damages to its mineral interest.

In summary, Angelina's causation theory of recovery boils down to Angelina's now claim of what it would or would not have done regarding the Louisiana settlement, but for the conduct of Prairie. In order for Angelina to prevail on its causation theory of recovery, Angelina must somehow erase the legal effect of its settlement with the Hankamers under Louisiana law. Under Louisiana law the Angelina–Hankamer settlement agreement constituted a perpetual bar to each party to subsequently claim an interest different from that to which they agreed. *See American Lung Ass'n v. State Mineral Bd.,* 507 So.2d 184 (La.1987). A somewhat in-depth review as to the effect of *American Lung Ass'n,* is appropriate. The Louisiana Supreme Court held that a compromise settling of title to minerals has the effect, as a matter of law, of declaring ownership rights *as those rights have always existed.* (emphasis ours) According to the Louisiana Supreme Court, the Louisiana settlement agreement, which was in evidence in this case, deems that Angelina owned one-third of the minerals both before and after settlement. Thus, we must conclude that the difference between the value of Angelina's mineral interest *before* and *after* its settlement with the Hankamers equals zero. (emphasis ours) Appellee seeks to limit *American Lung Ass'n,* to those situations in which the settlement "could in fact have been the court's judgment in the underlying case." Appellee argues that the Louisiana settlement gave the Hankamers an undivided ⅔ interest in all the disputed minerals; Angelina was left with an undivided ⅓; that should the Louisiana case gone to trial, the court would have been obligated to determine which of the sloughs crossing the lands were navigable. Further, such a finding would have established that the Hankamers owned 100% of the minerals on lands contiguous to the Rio Bravo Well, and that Angelina owned 100% of the minerals not contiguous to that Well. Then appellee concludes that, in no event could the trial court have found that the Hankamers owned ⅔ and Angelina owned ⅓ of the minerals underlying the entire tract, which was the status after settlement.

We believe Angelina's argument to be inapposite to the holding and intent of *American Lung Ass'n. American Lung Ass'n,* which creates a presumption that a settle-

ment determines ownership both retrospectively and prospectively, has nothing whatsoever to do with what judgment a trial court might actually enter after trial on the merits. By allowing this Texas jury to speculate as to causation, the jury of necessity was required to "go behind" the legal effect of Louisiana law, i.e., this Texas jury was allowed the prerogative of finding causation where under Louisiana law, under these circumstances, causation cannot exist either factually or legally. We set out portions of the Louisiana Settlement Agreement as follows:

This Settlement Agreement (the "Agreement") is made and entered into effective as of February 1, 1992....

. . . . .

WHEREAS, a controversy has arisen between the Hankamers and Angelina regarding ownership of the oil, gas, liquid hydrocarbons and other minerals underlying the Land, and said controversy is being litigated in the Louisiana Lawsuit; and

WHEREAS, in addition to the question of ownership of the oil, gas, liquid hydrocarbons and other minerals underlying the Land, the Hankamers, Angelina and George H. Henderson, Jr. have made various allegations against one another in the Harris County Lawsuit and the Angelina County Lawsuit which lawsuits arise out of alleged activities in connection with the dispute over the ownership of the oil, gas, liquid hydrocarbons and other minerals underlying the Land, but which lawsuits are not determinative, directly or indirectly, of the ownership thereof; and

WHEREAS, Angelina is a closely held corporation ... and this Agreement will benefit Angelina's stockholders; and

WHEREAS, the Hankamers, Angelina, and its shareholders desire by this Agreement to settle the Harris County Lawsuit, the Angelina County Lawsuit, and the Louisiana Lawsuit; therefore

KNOW ALL MEN BY THESE PRESENTS....

**I.**

Of the principal and interest in the Escrow Account, ... The remainder of the funds in the Escrow Account, both principal and interest, shall be paid one-third (⅓) to Angelina and two-thirds (⅔) to the Hankamers. Any reimbursements owed to Prairie in connection with the Minimum Royalty Agreement shall be paid to Prairie by the Hankamers out of their two-thirds (⅔) disbursement from the Escrow Account,....

**II.**

Angelina hereby acknowledges, confirms and ratifies the Hankamers' mineral servitude ... to which ... Angelina retains a one-third (⅓) interest in the minerals ... and ... the Hankamers' mineral servitude will cover and include the remaining two-thirds (⅔)....

**III.**

Angelina is hereby expressly recognized by the Hankamers as the owner of a one-third (⅓) mineral interest.... The Hankamers are expressly recognized by Angelina to be the owners of ... all of the oil, gas, liquid hydrocarbons and other minerals underlying the Land except as to the one-third (⅓) mineral interest retained by Angelina....

**IV.**

Consideration for dismissal of the Harris County Lawsuit and the Angelina County Lawsuit shall be the mutual dismissal of these suits by all parties....

**V.**

In connection with the execution of this Agreement, the following additional documents shall be executed and/or filed:

A. Motion to Dismiss and Order of Dismissal With Prejudice of the Louisiana Lawsuit....

B. Motion to Dismiss and Order of Dismissal With Prejudice of the Hankamers' action against Angelina ... in the Harris County Lawsuit,....

C. Motion to Dismiss and Order of Dismissal With Prejudice of Angelina's counterclaim against the Hankamers in the Harris County Lawsuit,....

D. Motion to Dismiss and Order of Dismissal With Prejudice of Angelina's action against the Hankamers in the Angelina County Lawsuit,....

E. Covenant Not to Sue and Indemnity Agreement by Angelina,....

## VI.

Nothing in this Agreement, or any of the attachments hereto, is intended to affect in any manner any cause of action owned by Angelina or its shareholders against Prairie, and Angelina and its shareholders expressly state that they intend to pursue, and they expressly reserve the right to pursue, any and all of their claims and causes of action (including without limitation the Angelina County Lawsuit) against Prairie.

## VII.

The parties shall cooperate to effect a disbursement of the funds in the Escrow Account to Angelina and the Hankamers as promptly as possible after the execution of this Agreement.

## VIII.

A. This Agreement as it relates to the Louisiana Lawsuit and the obligation to transfer the ownership of immovable property located within Louisiana shall be governed and construed under and according to the laws of the State of Louisiana. This Agreement as it relates to the Harris County Lawsuit and the Angelina County Lawsuit shall be governed and construed according to the laws of the State of Texas.

B. This Agreement shall be binding upon the Hankamers and Angelina....

C. This Agreement contains a full and complete statement of all of the terms, conditions and understandings of the parties with respect to the subject matter hereof....

D. When this Agreement has been approved by all of the Hankamers and Angelina the attorneys of record in the Louisiana Lawsuit are authorized to read this Agreement into the record of that case in open court as a binding settlement agreement as provided by law.

Angelina attempted to retain its cause or causes of action against Prairie for another day and another forum (Angelina County District Court). Subsequent to this Settlement Agreement between Angelina and the Hankamers, Prairie was required to make royalty payments pursuant to the agreement of those parties. The Settlement Agreement, was admitted into evidence and marked Defendant's Exhibit 287. Various attachments were made a part of Defendant's Exhibit 287 to which we give particular notice to Attachment C, which appears in the record as follows:

ATTACHMENT C

TO

SETTLEMENT AGREEMENT

FOURTEENTH JUDICIAL
DISTRICT COURT

FOR THE PARISH OF CALCASIEU

STATE OF LOUISIANA

NO. 89–5814 DIVISION
"A" DOCKET NO.

RAYMOND EDWARD HANKAMER, KATHERINE HANKAMER NORRIS, EARL CURTIS HANKAMER, III, JAMES RANDOLPH HANKAMER, CHARLES DOUGLAS HANKAMER TRUST (Doris K. Hankamer, Trustee), DORIS KUEHLER HANKAMER TRUST (Doris K. Hankamer, Trustee), CURTIS AND DORIS K. HANKAMER FOUNDATION TRUST (Doris K. Hankamer, Trustee), ROBERT F. BALL, III, MEREDITH BALL GRIFFIS, MELISSA BALL SHEPPARD and CAMRAY PROPERTIES, INC.

VERSUS

ANGELINA HARDWOOD LUMBER COMPANY, THE STATE OF LOUISIANA, THE STATE MINERAL BOARD OF THE STATE OF LOUISIANA, PRAIRIE PRODUCING COMPANY and SUN OPERATING LIMITED PARTNERSHIP

FILED:_____

———————————————

DEPUTY CLERK

*JOINT MOTION AND ORDER*
*OF PARTIAL DISMISSAL*

NOW INTO COURT, through undersigned counsel, come plaintiffs, RAYMOND EDWARD HANKAMER, ET AL (hereinafter the "Hankamers") and defendants, ANGELINA HARDWOOD LUMBER COMPANY ("Angelina"), THE STATE OF LOUISIANA, THE STATE MINERAL BOARD OF THE STATE OF LOUISIANA, PRAIRIE PRODUCING COMPANY ("Prairie") and SUN OPERATING LIMITED PARTNERSHIP, and on representing to the Court that said parties have reached a compromise of the claims asserted in the captioned matter and jointly move this Court to dismiss all claims asserted in the petition, as amended, any reconventional demands and any third party demands filed herein, with prejudice, each party to bear its own costs, EXCEPT as to the cross-claim by Angelina against Prairie for non-payment of royalties prior to _____, 1989. Respectfully submitted, . . . .

According to the foregoing Attachment C, Angelina attempted to except from the settlement agreement, Angelina's cross-claim against Prairie for nonpayment of royalties prior to a certain date. This was the subject of interest in the Angelina County Lawsuit. Appellants contend, and the record supports, that after the Louisiana Court dismissed the title dispute based on the settlement agreement, Angelina for the first time set forth to recover against Prairie the value of ⅔ of the mineral value which Angelina had agreed belonged to the Hankamers.

Further analysis of *American Lung Ass'n,* is necessary. The Louisiana Supreme Court defines "a transaction or compromise" as,

> an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.

507 So.2d at 189.

The record before us makes clear that neither the Hankamers nor Angelina had a "lock on winning" the Louisiana Lawsuit. *American Lung Ass'n,* makes clear that a settlement or compromise between parties becomes that agreement which is preferred by those parties in weighing the risk of winning against losing.

Angelina claims that but for Prairie's wrongful conduct, Angelina would have received or obtained a greater portion of the settlement pie. *American Lung Ass'n,* operates as a bar to such claim by Angelina. We cite from that opinion:

> Unlike a sale or an exchange, a compromise does not entail a conveyance, or the conferring of new rights. As described by Planiol in his *Treatise on the Civil Law,*
>
> "The compromise does not have the effect of conferring new rights on the parties, but only of recognizing those which they claim to have, and to consolidate them by protecting them from further litigation. It is therefore, not an act transferring rights, but purely an act in recognition, or declaratory, of such rights. *Neither party* (with respect to the rights recognized as theirs in the act) *acquires the thing of the other,* and does not, therefore, succeed to it; the parties merely kept what they already claimed to belong to them by obtaining the waiver of the other; *but they do not acquire anything.*" (emphasis theirs)
>
> 2 M. Planiol, *Treatise on the Civil Law* pt. 2, no. 2295 (11th ed. La.St.L.Inst.Trans. 1959)

507 So.2d at 190.

Under Louisiana law, Angelina gave up no interest nor acquired any interest. Query: Since, under Louisiana law, Angelina neither lost nor gained any royalty interest as a result of the settlement agreement, how can Angelina now claim that Prairie's conduct should in some way transcend this compromise settlement agreement?

It may be argued that the holding and reasoning of *American Lung Ass'n,* is based in "legal fiction." Even if this Court should

view that opinion as such, this Court is obligated and does adhere to the laws of the Great State of Louisiana and its applicability to the present subject matter. We cannot and shall not refuse a proper application of Louisiana law as that law affects the subject matter before this Court. Angelina was a party to that lawsuit pending in the Fourteenth Judicial District Court for the Parish of Calcasieu State of Louisiana Division "A," and as such, cannot now claim the inapplicability of Louisiana law.

Furthermore, we hold that all issues raised in the case before us should have been determined according to Louisiana law. Angelina's fraud claim, submitted under Texas law, is predicated on Prairie's promise, made in Louisiana, to remain neutral in a dispute pending in Louisiana State Court over title to minerals. Angelina's causation theory is that Prairie's fraudulent misrepresentation caused Angelina to settle the Louisiana lawsuit over title to Louisiana minerals, when Angelina otherwise would not have done so. Angelina's damages question required the jury, in effect, to decide who should have owned what portion of the Louisiana minerals that were the subject of the Louisiana title dispute and, as conceded by Angelina, "Louisiana law determines the ownership of minerals under Louisiana real property." Angelina sought attorneys' fees under the Texas Real Estate Fraud Statute, however the only real estate involved in this case is Louisiana real estate.

Angelina asks this Court to look to Section 148 of the Restatement pertaining to fraud and misrepresentation which provides:

(1) ....

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2) (1971).

Appellee contends that subsections (a), (d) and (f) are governed by Texas law. We believe that appellee misapplies Section 148(2). Regarding subsection (a), appellee contends that its signing of the leases in Texas allows Texas law to apply. Appellee admits that "lease negotiations were ... concluded at a meeting in Shreveport, Louisiana." Angelina also overlooks the June 21, 1989 letter agreement, which was signed in Louisiana before the leases were executed. At most, any "reliance" claim now made by Angelina to invoke Texas law, was the pro forma act of signing the previously agreed-to leases.

Appellee contends that domicile is a controlling factor. Comments to Section 148 provide that there must be two contacts "apart from the defendant's domicil[e] ... [that] are located wholly in a single state" before that state's law can apply. *Id. cmt. j. See Maxus Exploration v. Moran Bros.*, 817 S.W.2d 50, 53–54 (Tex.1991) (applying Kansas law even though both parties domicile in Texas).[1]

---

1. *See Lutheran Broth. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 310 (Tex.App.—Texarkana 1992), *writ granted and judgm't set aside w.o. ref. to merits*, 840 S.W.2d 384 (Tex.1992): The court's choice of law analysis turned on section *148(1)* of the RESTATEMENT, under which the domicile of the parties is irrelevant.

■ Regarding its fraud claim, Angelina seeks to use Texas law since Louisiana law does not allow punitive damages or attorneys' fees to be recovered in connection with a fraud claim.[2] Louisiana law provides that "punitive or other 'penalty' damages are not allowed unless expressly authorized by statute." *International Harvester Credit v. Seale*, 518 So.2d 1039, 1041 (La.1988). To date, the Louisiana Legislature has done so only in narrowly defined circumstances such as drunk driving and misuse of hazardous materials. *See La.Civ.Code Ann. arts.* 2315.3, 2315.4 (West Supp.1994).

Our Texas Supreme Court in *Gutierrez v. Collins*, 583 S.W.2d 312, 317 (Tex.1979) adopted the Restatement's "most significant relationship" test. Applying this test, the forum state has absolutely "no interest in affecting the result on the merits by displacing logical applicable forum law." The only nexus relating to those dealings between Angelina and Prairie is that of domicile, which standing alone, does not meet the "most significant relationship" test.

■ Appellants' point of error eight challenges the trial court's award of $50,000,000 punitive damages as found by the jury. This jury finding was conditioned upon an affirmative finding of fraud, submitted under Texas law.

■ The trial court submitted its fraud questions 1 and 2 under our Texas Statute titled "Fraud in Real Estate and Stock Transactions." TEX.BUS. & COM.CODE ANN. § 27.01 (Vernon 1987). Again, punitive damages are not recoverable under Louisiana law except in certain toxic tort or drunk driving cases. *See La.Civ.Code Ann.* arts. 2315.3, 2315.4 (West Supp.1994); *International Harvester Credit v. Seale*, 518 So.2d 1039, 1041

(La.1988). Furthermore, attorneys' fees are not recoverable under Louisiana law except where authorized by statute or contract. *See Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 763 (La.1985). In determining that the trial court erred in awarding punitive damages through application of Texas law, same not being recoverable under Louisiana law, appellants' point of error eight is sustained and the trial court's judgment awarding punitive damages is reversed and judgment is hereby rendered that appellee take nothing by way of punitive damages. In sustaining appellants' point of error eight we need not address appellants' points of error seven and nine which relate to the $50 million dollar punitive damage award.

Having determined that the trial court's judgment awarding actual damages through answers to Jury Question No. 4 and punitive damages through Jury Question No. 6 was improper we make brief address to appellants' points of error ten, eleven and twelve as same relates to the trial court's awarding of attorneys' fees in favor of Angelina.

Jury Question No. 5 reads as follows:

If you have answered "Yes" to Question No. 1 or Question No. 3, then answer Question No. 5. Otherwise, do not answer Question No. 5.

QUESTION NO. 5

What sum of money do you find to be reasonable and necessary attorneys fees for the services by Angelina Hardwood Lumber Company's attorneys as follows.

Answer in dollars and cents, if any.

a. For legal services rendered in the preparation and trial of this cause to the Court.

Answer: $ 367,000.00

---

*Grynberg Production Corp. v. British Gas P.L.C.*, 817 F.Supp. 1338, 1350 (E.D.Tex.1993): To the extent the choice of law issue was discussed, the court clearly indicated that Kazakhstan law, not Texas law, was likely to govern "most or all of the claims.... Many of the allegedly tortious acts took place in Kazakhstan, and the situs of the mineral property [was located] in Kazakhstan."
*Wall v. Noble*, 705 S.W.2d 727, 733 (Tex.App.— Texarkana 1986, writ ref'd n.r.e.): This was a negligence case, not a fraud case controlled by section 148 of the RESTATEMENT. The choice of

law ruling did not turn on the plaintiff's residence in Texas, but on the fact that "[t]he injury and negligence charged was referable to action, conduct, and omissions that occurred principally in Texas...."

2. Appellee argues that Louisiana now, "has moved closer towards the policy of the vast majority of its sister states, allowing punitive damages in certain cases." Closer toward is not close enough for this Court's expansive invasion of Louisiana's legal territory.

b. For legal services if this cause is appealed to the Court of Appeals.

Answer: $ 80,000.00

c. For legal services if an application for writ of error to the Supreme Court of Texas is filed.

Answer: $ 12,000.00

d. For legal services if the Supreme Court of Texas grants a writ of error.

Answer: $ 4,500.00

Since the jury's award of attorneys' fees was conditioned upon an affirmative answer to Jury Questions Nos. 1 or 3, we must sustain appellants' point of error ten and eleven. If the jury's answer to Jury Question No. 5 be premised upon its affirmative answer to Jury Question No. 1, we have already determined that Texas law (fraud) is not applicable to the case before us. Thus, we are left with a determination of whether attorneys' fees would be proper based upon the jury's affirmative answer to Jury Question No. 3. Since we have previously determined that attorneys' fees are not recoverable under Louisiana law except where authorized by statute or contract, *see Quealy,* 475 So.2d at 756, our conclusion must be that the trial court erred in awarding attorneys' fees to Angelina and judgment is hereby rendered that Angelina take nothing by way of attorneys' fees.

Our previous rendition of judgment relating to actual damages, punitive damages and attorneys' fees makes moot appellants' point of error thirteen which contends that the trial court erred and abused its discretion in its award of pre-judgment and post-judgment interest.

Finally, caution dictates that we make brief address to appellants' point of error four which reads as follows:

Because the evidence conclusively established as a matter of law that the Lumber Company ratified its leases with Prairie with full knowledge of Prairie's allegedly wrongful conduct, the trial court erred in overruling Defendants' Motion for Judgment *Non Obstante Veredicto* and to Disregard Jury Findings. Alternatively, because the jury's refusal to find, in response to Question No. 7, that the Lumber Company ratified its leases with Prairie with full knowledge of Prairie's allegedly wrongful conduct is against the great weight and overwhelming preponderance of the evidence, the trial court erred in overruling Defendants' Motion for New Trial, Motion for Remittitur, and Motion to Reform Judgment.

The following question and instructions were presented to the jury as Jury Question No. 7:

If you have answered "Yes" to Question No. 1 or Question No. 3, then answer Question No. 7. Otherwise, do not answer Question No. 7.

QUESTION NO. 7

Did Angelina Hardwood Lumber Company ratify its leases?

A plaintiff may ratify a fraudulent contract if it has full knowledge of the fraudulent acts at the time of ratification and it intentionally and voluntarily chooses to ratify the contract in light of that knowledge. Ratification may then occur if the plaintiff, after acquiring such knowledge, enters into a new agreement with the other party by which the rights of the parties are adjusted.

In deciding whether Angelina Hardwood Lumber Company ratified the leases, you should consider its conduct and its knowledge at the time of the ratification, if any.

Answer "Yes" or "No".

Answer:   NO

Given the text and holdings heretofore set forth coupled with the failure of the trial court's judgment to address this jury finding, we hold the answer to Jury Question No. 7 to be immaterial to any purpose.

In view of our sustaining appellants' points of error four, six, seven, eight, nine, ten, eleven, twelve and thirteen, there exists no necessity in addressing appellants' points of error one, two, three and five, which constitute "legal insufficiency" or "factual insufficiency" of the evidence.

The judgment of the trial court is hereby reversed and judgment is herein rendered

that Angelina have and recover nothing from Prairie.

REVERSED AND RENDERED.